[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed July 31, 1997
This is an action brought by the State of Connecticut, through its Attorney General seeking an injunction to enforce the provisions of General Statutes 53-289, titled "Ticket scalping." The action further seeks certain additional remedies. The action is pursued under General Statutes 42-110b(a), the Connecticut Unfair Trade Practices Act.
The defendant is Roderick N. Cardwell, d.b.a. Ticketworld. Mr. Cardwell is a resident of the State of Connecticut. He conducts his business in two locations. One location is on Asylum Street in Hartford, Connecticut. The other location is in Springfield, Massachusetts.
Ticketworld advertises in newspapers in the State of Connecticut. The advertisements instruct prospective customers to phone the Hartford location for tickets to entertainment events which are to take place outside of the State of Connecticut. The advertisements instruct prospective customers to telephone the Springfield, Massachusetts office for tickets for entertainment events which are to take place within the State of Connecticut. If telephone calls for Connecticut performances are made by prospective customers to the Hartford location, seeking to purchase tickets for Connecticut events, the Hartford personnel do not take such orders. They direct the prospective customer to telephone the Springfield, Massachusetts office. There is no evidence before the court to indicate that the personnel in the Hartford office have ever deviated from this practice.
The statute in question is General Statutes § 53-289. The statute reads as follows:
 No person shall sell, offer for sale or attempt to sell any ticket, privilege or license of admission to an entertainment event, including, but not limited to, any place of amusement, arena, stadium, theater, performance, sport, exhibition or athletic CT Page 12524 contest given in this state, at a price greater than the price, including tax, printed thereon, or at a price greater than the price fixed for admission, including tax, and a reasonable service charge for services actually rendered not to exceed three dollars. The owner or operator of the property on which such entertainment event is to be held or is being held may authorize, in writing, any person to sell such ticket, privilege or license of admission at a price in excess of that authorized under this section. Such writing shall specify the price for which such ticket, privilege or license of admission is to be sold. Any person violating any provision of this section shall be guilty of ticket scalping. Ticket scalping is a class C misdemeanor for a first offense, a class A misdemeanor for a second offense and a class D felony for any subsequent offense. The sale of each ticket, privilege or license of admission in violation of any provision of this section shall constitute a separate offense.
The court finds, from the evidence, that on a number of occasions in the past the Springfield, Massachusetts office has sold to customers tickets to Connecticut events for prices which are substantially in excess of the maximum statutory price of the fixed admission price, including tax, plus the allowable statutory markup of "three dollars." This evidence was produced through the testimony of one Ms. Lupovitch who paid $125 per ticket for tickets which had a box office price of $32.50 per ticket for an event at the Connecticut Tennis Center in New Haven. And by a Ms. Van Ormer who paid $60 per ticket for tickets which had a box office price of $28 per ticket for an event at the Hartford Meadows. And by a Ms. Bergeron, who paid $137 per ticket which had a box office price of $53.50 per ticket, for an event at the Meadows in Hartford. And by a Ms. Martin who paid $65 per ticket which had a $26.50 box office price for an event at the Hartford Civic Center.
The defendant does not seriously contest the fact that tickets sold through the Springfield, Massachusetts office are sold for a price greater than the statutory Connecticut maximum limit of"a price greater than the price fixed for admission, including tax . . . plus three dollars" for performances given in Connecticut. It should appear obvious, and it is found, that the CT Page 12525 reason for referring Connecticut calls to the Massachusetts office is to avoid the limitations imposed by the maximum price allowed to be charged for Connecticut events.
The defendant asserts several special defenses which challenge the constitutionality of the statute itself. The third special defense claims that the statute "is in restraint of a trade in commerce far beyond the police power of the state to regulate. The fourth special defense claims that the statute "is unreasonable and arbitrary, and is in violation of the due process and equal protection clauses of the fourteenth amendment of the United States Constitution." The sixth special defense claims that the statute "does not have a reasonable relationship to a proper legislative purpose and is in violation of the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution."
A brief history of litigation involving statutes of this type is appropriate. In 1926 the United States Supreme Court determined the case of Tyson Brother v. Banton, 273 U.S. 618 to 456. The statute at issue was a New York statute which prohibited the resale of theater or other amusement tickets "at a price of in excess of fifty cents in advance of the price printed on the face of such ticket or other evidence of the right of entry."
Mr. Justice Sutherland delivered the opinion for the majority of the court, and hence articulated the decision of the court. The decision determined that it is "the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself . . . and, as such, within the protection of the due process of law clause of theFifth and Fourteenth Amendments." "Owner" refers to the owner of the ticket. (P. 429.) The majority decision then determined that "The evil of collusive alliances between proprietors of theaters and ticket brokers or scalpers . . ." may properly be prohibited by law: but that a law which forbids "the resale by a purchaser of it for any price he was able to secure" would in fact be constitutionally impermissible. See Tyson, supra, p. 443, 444.
Mr. Justice Stone, writing a dissenting opinion, joined in dissent by Justice Holmes, Justice Brandeis and Justice Stanford opined that this subject was a proper subject for legislative determination, on the basis that regulation of this activity is in fact in the public interest. CT Page 12526
This trial court finds significance in one portion of the dissent of Mr. Justice Stone: "The statute requires only that the sale price, whatever it is, be printed on the face of the ticket, and prohibits the licensed ticket broker, an intermediary in the marketing process, from reselling the ticket at an advance of more than fifty cents above the printed price. Nor is it contended that this limit on the profit is unreasonable. It appears that the business is now being carried on profitably by ticket brokers under this very restriction. But if it were not, there could be judicial relief without affecting the constitutionality of the measure." Tyson, supra p. 449.
In 1964, in the case of Gold and New York Ticket Brokers,Inc. v. Joseph C. DiCarlo, Commissioner of Licenses of the Cityof New York, 235 F. Sup. 817, the United States District Court for the Southern District of New York, determined that the New York statute imposing a resale price limit of a maximum of $1.50 plus lawful taxes in excess of the maximum price printed on the ticket, was not unconstitutional. In an unusual, and perhaps near unique decision, the District Court directly rejected the decision of the United States Supreme Court as articulated inTyson Brother v. Banton, supra. The District Court determined that "Tyson and Brother v. Banton, is only an illusory barrier" (p. 819).
The rationale of the District Court was that "the Tyson
standard had been disregarded" (p. 819). Further, ". . . that the case is no longer a binding precedent but simply a relic for the constitutional historians." In essence the District Court determined that "the admission price for public amusements is" `a matter affected with a public interest' and (is) subject to supervision to safeguard the public against fraud, extortion, exorbitant rates and similar abuses." Gold, supra, p. 818.
The United States Supreme Court, in Gold v. DiCarlo,380 U.S. 520 (1965), in a one-line per curiam decision, on the appeal from the United States District Court, affirmed the District Court, hence effectively overruling its own decision in Tyson Brotherv. Banton, supra, "The motions to affirm are granted and the judgment is affirmed." (P. 520.)
The present Connecticut statute, Sec. 53-289 was revised in 1983 by Public Act 83-585. The prior statute prohibited a sale of a ticket "at a price greater than ". . . the price, including tax, printed therein . . ." The 1983 amendment allowed for "the CT Page 12527 price fixed for admission, including tax, and a reasonable service charge for services rendered, not to exceed three dollars." It is of historical interest to note that the prior statute was first enacted in 1923, and was reenacted in 1930, subsequent to the Tyson decision, with no reported history of enforcement activity, one way or the other.
The Connecticut Supreme Court, in 1991, addressed the question of whether the ticket scalping law, General Statutes § 53-289, was in violation of the equal protection provisions of the federal and state constitutions. The court concluded that the law was in fact constitutional. "We conclude, therefore, that the defendants have not met their burden of establishing that Sec. 53-289 bears no rational relationship to a legitimate objective, in violation of the equal protection provisions of the federal and state constitutions." State v. Leary, 217 Conn. 404,412 (1991).
 II
It has been determined by both the United States Supreme Court and the Connecticut Supreme Court that the legislature does have the right to establish limits as to the resale price of tickets to amusement events. This trial court is bound by those determinations.
The defendant calls to the Court's attention several factors which warrant consideration. First, that the scarcity of prime tickets to events are not caused by the monopolizing of such tickets by ticket sellers, but rather are caused by the operators and the promoters. The court determines, from the evidence, that the defendant has proven this contention. For many of the musical events prime tickets are reserved for and distributed at the will and caprice of the entertainers and the promoters, thus removing those tickets from availability to the general public. A further illustration of such exclusionary treatment applies, for example, to the University of Connecticut basketball games whereby the availability of favored tickets depend upon a substantial contribution to the athletic program. Although such contributions are not directly added to the ticket price, it would be illusory to assume that they are of a solely charitable or civic nature, wholly unrelated in reality to the effective economic price of the ticket.
The defendant further points out that ticket sellers do CT Page 12528 perform a public service in that they make tickets available to customers without the necessity of the customer coming to the venue to wait in long lines to purchase tickets. Further, as a secondary market, they provide access to prime tickets which would not otherwise be available to the public. The preferential holders of these tickets who may for personal reasons be unable to attend a particular event customarily seek out the secondary ticket sellers to market the ticket for them, thus providing a significant benefit for both the preferred ticket holder and the non-preferred member of the public who otherwise would have no access to tickets which were made artificially scarce by the above practices.
The court finds each of these considerations to be proven by the defendant. However the court determines that this legislation, as is customary with this type of legislation, involves a balancing of contrasting public interests. The legislature must be presumed to have considered a balancing of, a choice between competing interests. Within established constraints, it is for the legislature to determine priorities between competing public interests.
 III
The defendant, is the brief, and as is generally framed in the articulation of third special defense and fourth special defense, contends that "three dollars over face is not a `Reasonable Service Charge.'" This is a matter which this court must address as pertains to this legislation.
"An act regulating economic activity must bear a reasonable relationship to a proper legislative purpose in a manner that isneither arbitrary nor discriminatory." State v. Leary, supra, p. 409.
In support of his contention the defendant offers evidence to demonstrate that the price of tickets sold to consumers by other ticket sellers who regularly do business in Connecticut invariably exceed three dollars above the price printed on the ticket. The court credits that evidence. Ticketmaster, a well known ticket selling business, charges $3.75 above face for tickets sold directly at their outlet, and $4.50 to $6.50 over face for telephone orders.
Strawberries, the Protix outlet for sale of Hartford Meadows CT Page 12529 Music theater events charges $3.75 over face plus a $2.50 mandatory parking fee whether one parks or not. For non-parkers this is $6.25 above face. Additionally, in the case of Protix one must pay a membership fee of $150 to $300 to have the right to by one ticket each for each event. The court is not aware of the number of events per year. However it is obvious that if there were, for example, fifteen events this would raise the price of the ticket to between ten dollars and twenty dollars above face, as the "member" must additionally still buy the ticket at printed price for each event.
Oakdale in Wallingford also has "membership fees" to enable one to buy prime tickets. Foxwoods, in Ledyard, holds all of its best seats for preferred people. Donations to the University of Connecticut for the purpose of being able to be guaranteed prime tickets have been previously discussed.
The defendant claims, under this set of circumstances, that the statutory limit of three dollars over face is a totally unreasonable limit, as demonstrated by this universal practice of avoidance. Although not so articulated by the defendant, the Supreme Court, in State v. Leary, supra, states "An act regulating economic activity must bear a reasonable relationship to a proper legislative purpose in a manner that is neither arbitrary nor discriminatory." State v. Leary, supra, P. 409.
A. DISCRIMINATION
First, as to the question of "discriminatory." The legislation does not, on its face, single out certain ticket sellers and treat them in a fashion different than other ticket sellers. Hence the statute is not prima facie discriminatory. The statute applies to all persons who secondarily sell tickets and hence, on its face, is nondiscriminatory. See Gold v. DiCarlo,supra, p. 821.
Some further consideration must be given to the question of whether the provision of the statute allowing the authorizing by the owner or operator of the property to allow others to charge prices which are in excess of the statutory limit is discrimination. The Supreme Court, in State v. Leary, supra,
addresses that question. The Supreme Court determined that "since an owner is free to enter into contractual relations regarding the price of tickets for his own pecuniary benefit, the exemption was appropriate . . ." State v. Leary, supra, p. 411. Stated CT Page 12530 otherwise, if the owner can charge whatever price he so chooses, he can also authorize others to do so.
Caveat, however; The Supreme Court determined that since there was no evidence before the trial court so as to conclude that owners were in fact authorizing others to sell tickets at an unreasonable mark-up, the defendant had not met his burden of establishing that this provision resulted in grossly excessive mark-ups, bearing in mind that it is the practice of unreasonable
mark-ups that was in fact the concern which the legislature sought to address.
Although the evidence in this instant case demonstrates that the unavailability of prime tickets at printed ticket prices is not caused by the activity of secondary ticket sellers, but by preferential practices engaged in by the owners and operators of the venue, which potential monopoly appeared initially to be the concern of the legislature, yet no evidence has been provided to compel, or to support, a conclusion that any direct activity of the venue, if any, in specifically allowing selected ticket sellers to charge amounts in excess of the statutory minimum has resulted in the charging of "unreasonable" or "grossly excessive" prices by any authorized preferred ticket seller. (State v.Leary, supra, p. 412.)
Furthermore, on the matter of discrimination, the defendant has produced no evidence, nor does he assert, that he has requested of and was refused, by any owner or operator, an authorization to sell tickets for a price in excess of that authorized under General Statutes 53-289. This court can not address questions of hypothetical discrimination where no evidence is produced to place before the court a claim of actual discrimination.
B. ARBITRARY
As to whether the three dollar limit is arbitrary is a second consideration, under State v. Leary, supra. The evidence produced by the defendant is that all of the other ticket sellers referred to in the evidence are selling tickets for amounts greater than the three dollar limit.
The Supreme Court, in State v. Leary, supra, does not address this question directly. The defendant in that case took the position that the additional charges, above printed ticket price CT Page 12531 was a "delivery charge based upon the costs incurred by them in procuring them and placing them in the buyer's hand."
The term "delivery charge" does not appear in the statute. However the Supreme Court accepted the trial court's finding, as follows: "The trial court found that the additional charges by the defendants were not based upon the cost of delivery, such asmailing costs or mileage, but rather were costs based upon the quality of the ticket, in terms of the desirability of the seat it requested, and the cost of procuring the seat." The defendants did not challenge this evidentiary finding in the trial court. "The Supreme Court shall not be bound to consider a claim unless it was distinctively raised at the trial or arose subsequent to trial. We therefore decline to address this claim further." Statev. Leary, supra, P. 413.
It is obvious that the statute, as written, has the potential of utilizing phrases which may grammatically be interpreted as being contradictory and irreconcilable. The term "a reasonable service charge for services actually rendered" and the phrase "not to exceed three dollars" may possibly be factually inconsistent in the economic climate of the 1990s. However the court cannot conclude that the two phrases are in fact contradictory or totally inconsistent on the basis of the evidence produced at this trial.
The court does note that prior to 1983 (Public Act 83-585) the statute provided for no allowance whatsoever above the price fixed for admission. The court further notes that the defendant was not in business in 1983 and hence cannot claim a vested property right which would have been affected by the enactment of the more liberal 1983 legislation.
The evidence which the court has before it is that many of the ticket sellers, in fact all of those who were mentioned by the defendant, do sell tickets at an amount in excess of the three-dollar limit. Yet the court cannot conclude from the evidence presented whether this otherwise excessive fee is based upon "a reasonable service charge for services rendered" (to wit, mailing and mileage) on the one hand, or conversely by a practice of profiteering, in various degrees, or alternatively by virtue of owner or operator authorization, as specifically allowed by statute.
In its liberal construction the term "reasonable service CT Page 12532 charge" as pertains to any private business, would seem to imply recapture of reasonable and customary expenses in conducting a private business, and conceivably a reasonable profit. If this be the case then the out-of-pocket, or perhaps more appropriately, the market cost, of rent, labor, telephone, utilities, transportation, taxes, mailing, security and the like would be taken into consideration. Otherwise, it would have to be assumed that a private sanctioned business, operating in an economically responsible and fiscally prudent manner would be expected to operate at a loss, where income could not cover expenses. Such a conclusion would be irrational and totally inconsistent with the concept of an authorized properly regulated business activity.
The Supreme Court, in State v. Leary, supra, p. 407, appears however to accept the trial court's interpretation that the statutory phrase allows only "mailing costs or mileage to make the delivery." The basis of that statutory interpretation, by that trial court, is not further articulated, but does appear to be accepted by our Supreme Court. A right to normal business profit or expense recapture does not therefore appear to be encompassed in the term "reasonable service charge."
This court has reviewed the comprehensive dissertation concerning "Ticket Dealing Laws" as set forth in 81 A.L.R.3rd 655. In the case of Kelly-Sullivan, Inc. v. Moss, (1940) 22 NY.L.2d 491, aff'd 260 App.Div. 921, 24 NY.L.2d 1984, the New York court dealt with the question of whether the absolute fixing of 50 cents as the maximum premium to be charged by the ticket brokers was in fact confiscation. The New York court found ". . . that the kind of business conducted by the plaintiffs was a lawful business performing a lawful service . . . However, that court found that plaintiffs assertion of deprivation of a right to a fair return to be "utterly inconclusive and unproven because it was not based upon the profit and loss experience of the industryas a whole." 81 A.L.R.3rd 655, Sec. 33, p. 695. (Emphasis added.)
It is further to be noted that there is a division of authority amongst the various states as to whether even an absolute prohibition against any increase above the printed tickets price is constitutional. See 81 A.L.R.3rd, Sec. 14, P. 698 to 703. Some of the cases reviewed by this court deal with statutes which set a strict articulated dollar limit above the face of the ticket. Some states allow for additional undefined "service charges," but specifically exclude charges related to the general business operations of the said licensee. A right to CT Page 12533 normal business profit or expense recapture does not appear to be encompassed within the laws of other states.
The court does note that the three-dollar limit was set in 1983, some fourteen years ago, and has not changed since that time. The court may also take note of the fact that the cost of almost everything, including normal business expenses, has increased since that time. Nothing in the legislative history, however, indicates that the legislature either did, or intended to allow for customary business expenses or profit in enacting this legislation.
From the foregoing analysis it does not appear that the setting of a strict dollar mark up limit for the resale of tickets is a violation of constitutional rights. It is noted that General Statutes § 53-289 does not specifically sanction, and then attempt to regulate, secondary ticket sales on the basis of a necessary activity conducted in the public interest, and to thereafter set and periodically modify fees. Such is the case with public utilities such as water, electricity, natural gas, cable television and the like, the purpose of which is to guarantee that the public will receive quality necessary services by providing the business incentive of a fair recapture of expenses and a reasonable return on investment. No such compelling public necessity for ticket resale services is delineated expressly or by inference within this statute.
The statute states "no person shall . . ." The statute does not contain any implication that the activity is a business activity in the public interest, and hence entitled to recapture of business expenses and minimum profit or return on investment. The statute simply states that all persons engaged in that activity, regardless of motive profit or otherwise — must do so under specified restrictions.
Even if the rationale of Kelly-Sullivan, Inc. v. Moss, supra, which appears to uniquely recognize a profit motive, were to be applied to this statute as related to the defendant's activities, yet that argument would still fail. The Connecticut statute, Sec. 53-286 restricts only the sale of tickets for performances "given in this state." It does not set price limits on events which occur outside of this state. The defendant maintains a Hartford office from which he sells tickets for out-of-state events. There is no indication that the defendant's Hartford activity, operating under its Connecticut events restriction, is not CT Page 12534 reasonably profitable under those circumstances, or that the inability to sell tickets for Connecticut events for more than the three-dollar limit deprives him, or anyone, of the ability to profitably conduct a ticket resale business in Connecticut, based upon a profit and loss experience for his Hartford activity, let alone the experience of the "industry as a whole" in Connecticut. See Kelly-Sullivan, Inc. v. Moss, supra. The mere assertion that a person cannot sell one product of a line of products at a profit does not compel a conclusion that the business activity of selling tickets cannot be conducted in Connecticut on a profitable basis.
In essence the statute must be construed to mean that the ticket seller may recapture only that portion of a reasonable service charge, whether that be delivery or any other charge, which does not exceed three dollars. Absolute dollar limits have been held to be constitutional, allowing for what may conceivably be a recapture of only part of a service charge, specifically limited to a three-dollar amount.
As pertains to the instant action "The party attacking the constitutionality of a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt" State v. Leary, supra, P. 410. The defendant in this case has not satisfied that burden.
 IV
The defendant contends that he is not subject to the statute because the business which he conducts from the sale of Connecticut tickets occurs through his office in Springfield, Massachusetts.
"Ticket World" is Roderick Cardwell, a resident of West Hartford, Connecticut. The fact that he does business in two locations does not alter that fact. His Springfield, Massachusetts location is not a separate legal entity. It is not a corporation; nor is it a limited partnership, or any type of activity whereby he is merely a passive investor-owner of an equity interest in an out-of-state activity. This court deals with the matter at hand, the issues in this case, and does not deal with other and hypothetical circumstances.
The defendant Roderick Cardwell, a resident of Connecticut, was served process at his usual place of abode in West Hartford, CT Page 12535 Connecticut. This court has personal jurisdiction over the defendant, a matter which was not contested in this action.
The activity of the defendant d/b/a Ticket World, in connection with his location in Springfield, Massachusetts is the activity of Roderick Cardwell, whether it be done by himself, or with his knowledge and consent by his agents, servants and employees. Further, this is a civil action, not a criminal action, and hence the defendant would be civilly responsible for the activity of his agents, servants and employees occurring in the course of their employment.
The mere fact that he does business from an office in Springfield, Massachusetts, as well as his office in Connecticut, does not in and of itself legally dissociate him from the Springfield entity for the purposes of business activity which may take place in whole or in part within the boundaries of the state of Connecticut.
 V
The defendant further claims that the activity which took place through the Springfield, Massachusetts office does not constitute a violation of General Statutes § 53-289.
The test to be applied to this contention is relatively clear as applies to the facts of this case.
 "A person who commits a crime partly in one state and partly in another state may be tried in either state under the sixth amendment of the United States Constitution." State v. Ross, 230 Conn. 183, 199 (1994). "Every sovereignty has the right, subject to certain restrictions, to protect itself from, and to punish as crimes, certain acts which are peculiarly injurious to its rights or interests of those of its citizens, wherever committed." State v. Ross, supra, p. 198. (Emphasis added.)
The statute, Sec. 53-289, states "No person shall sell, offer for sale or attempt to sell any ticket" for an event given in this state. As this aspect of the CUTPA claim, though civil, is based upon the violation of a criminal statute, the court must address whether the defendant's activity violates the criminal statute. CT Page 12536
"An offer is an expression by one party of his assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express his assent to the same terms." Corbin on Contracts, One Volume Edition, Sec. 11, P. 10, 11. This principle of law is of such elementary nature as to require no great elaboration. The defendant contends that the office in Springfield does not engage in selling or offeringto sell in Connecticut. He contends that such activity does not take place here in Connecticut. The evidence is however to the contrary.
The defendant sets the terms for the sale when responding to the customer's phone call from a Connecticut location. It is elementary that an offer is not made until it is communicated. Williston on Contracts, supra Sec. 33 "An offer must be communicated." No "communicated" can take place until the message comes to the attention of the offeree, that is until the offer reaches the ears or the eyes of the prospective customer. For example, speaking into a dead telephone could not be considered to be the making of an offer.
The offer is made when it reaches the ear of the customer, here in Connecticut. The making of such offer, communicated to the customer located in Connecticut, is prohibited by statute.
Conversely, if the customer phones into Massachusetts a predetermined precise offer, complete in all material details, to buy a ticket, the offer would be made in Massachusetts. Acceptance of the offer for an oral bilateral contract must also be communicated. And that would occur when the acceptance by the defendant reaches the ear of the customer in Connecticut. At that point in time the contract would have been made, and the sale would have been made here in Connecticut. In that alternative scenario the sale, made here in Connecticut, would be a violation of the term of the statute which states "no person shallsell . . ."
The transaction by phone, either "sell" or "offer for sale," would constitute a violation of General Statute 53-289. The defendant takes the position, in the brief, that the sale takes place when the tickets are placed in transit, by giving the defendant delivering the ticket to the common carrier, or placing the ticket in the mail, and that this occurs in Massachusetts. The defendant confuses the question of passage of title to CT Page 12537 specified goods with the here relevant question of the entering into a contract for sale.
Questions of title to specified goods generally arise in disputes where the goods are lost or damaged in transit. See General Statutes § 42a-2-319, "F.O.B. and FAS terms," dealing with risk of loss, depending upon "free on board" terms of the sale. The delivery of goods, the placing of the goods in transit,presupposes that a contract for sale, a sale, has taken place. Delivery concerns itself thereafter only with the performance of the sale, the manner in which the purchased goods will be delivered, so as to transfer title, and to who will bear the risk of loss in transit. See General Statutes § 42a-2-307
illustrating the difference between sale of goods and subsequent delivery of the goods. Delivery is not the contract. It is the performance of the previously made contract of sale.
General Statutes § 53-289 deals with the sale of the goods, and not with questions of the time passage of title, or risk or of loss in transit.
Lastly the court turns to the question of whether, as contended by the plaintiff, advertising within Connecticut, or referral by the Hartford office to the Springfield office concerning the availability of tickets for Connecticut events constitute a violation of this statute if such referral is for the purpose of selling tickets for Connecticut events for charges in excess of the allowable statutory mark-up.
The court finds that the defendant advertises in various publications circulated in Connecticut, including newspapers and telephone directories. The advertising directs that customers are to call Springfield for all Connecticut events, and to call Hartford for all events worldwide occurring outside of Connecticut The court further finds that if a prospective customer calls Hartford seeking tickets for a Connecticut event the personnel at Ticketworld in Hartford will refer the caller to the Springfield telephone number to obtain Connecticut tickets.
No business reason is advanced for this procedure, such as a greater proximity of Springfield to the venue of the event, or the like. The court infers, and it is not disputed by the defendant, whose testimony was very candid, that there is in fact no reason for this procedure other than the fact of existence of, and avoidance of, the three dollar limitation of the statute. CT Page 12538 Hence the term "attempt to sell" as utilized in this statute poses a question of statutory interpretation, as advertising or direct referral to a source for the purpose of negotiating a sale is neither an offer to sell nor a sale. The court must therefore assume that the statutory phrase attempt to sell has meaning beyond "sell, offer to sell," and cannot be treated as meaningless.
"In statutes, and in cases other than criminal prosecution an `attempt' ordinarily means an intent combined with an act falling short of the thing intended. It may be described as an endeavor to do an act carried beyond mere projection, but short of execution." Blacks's Law Dictionary, Fourth Revised Edition, p. 162.
At law, advertising the availability of goods, including even an invitation to bid, is not an offer. The subsequent bid is the offer. ". . . a bid, even the responsible one, submitted in response to an invitation for bids, is only an offer which, until accepted by the municipality, does not give rise to a contract."Admore Construction Co. v. Freedman, 191 Conn. 497, 501 (1983). "The construction is rather favored that such an advertisement is a mere invitation to enter into a bargain rather than an offer."Williston on Contracts, Revised Edition, Sec. 27, p. 26. The placing of an advertisement in a newspaper designating a place where business transactions for specified goods may take place is not an "offer for sale." Yet this does not end the inquiry.
The court takes notice that similar language, which goes beyond "sale or offer to sell," is utilized in a Connecticut statute dealing with an activity which is permitted in other states, but prohibited in Connecticut. General Statutes 29-357, prohibiting dealing in fireworks (which is permitted in the Carolinas) contains the phrase ". . . offer for sale, expose forsale, sell at retail . . ." (emphasis added). The court determines that the phrases "attempt to sell" and "expose for sale" are sufficiently broad and comprehensive, within the common usage of those terms, to encompass the activity of advertising, or of specific referral to a selling location, for the purpose of selling, and therefore constitutes an "attempt to sell." Such activity, though not an "offer" or a "sale" is an integral part of the business of selling tickets, in the same fashion as is the merchandizing of any other product. Hence if the selling or offering for sale tickets in excess of the three dollar mark up is a violation of the statute, so would be the Connecticut CT Page 12539 advertising for sale, or referral to another location for prospective sale, of tickets which are to be sold at an excess mark up at locations either within or without the state of Connecticut. This is so regardless of, and even if, such actual selling activity (offer, acceptance and delivery) is to be thereafter solely and exclusively confined to a physical location outside of the boundaries of this state.
The court concludes that advertising within Connecticut directing the public to an out-of-state location, or referral made in Connecticut to an out-of-state location, the purpose of which is to direct persons to an out-of-state location for the purpose of purchase and sale for prices which exceed prices permitted by statute, constitutes a violation of General Statutes § 53-289.
SUMMARY
The court determines that any and all activity of the defendants, his agents, servants, employees, or independent contractors acting on his behalf with his knowledge or consent, which activity takes place in whole or in part within the State of Connecticut, constitutes a violation of General Statutes §53-289 for the purposes of this civil litigation, if the consequences of any such activity leads to the sale by the defendant of tickets to an entertainment event given in the State of Connecticut, for an amount greater than three dollars above the price printed on the ticket. This would include advertising, promotion and referral activities engaged in within this state by the defendant for such purposes, as well as the making of offers or acceptances by telephone communication transmitted into this state and includes the physical delivery of tickets into this state, which have been sold solely and exclusively outside of this state, by mailing, carrier, messenger or other means or method of interstate delivery.
The court further determines that activities which take placesolely and exclusively outside of the borders of the state, bearing in mind the comprehensive nature of the activities prohibited by this court's determination of the issues in this case, would not constitute a violation of this statute, nor a consequent violation of CUTPA. See State v. Ross, 230 Conn. 183
(1994).
The plaintiff seeks an injunction enjoining the defendant CT Page 12540 from attempting to sell "to Connecticut Citizens" tickets in excess of the prices allowed by statute. The phrase "toConnecticut citizens" does not appear in this statute. The impact of what is sought by this request is that if all of the activity is accomplished solely and exclusively within another state Connecticut citizens would be unable to purchase tickets in that other state.
This calls into question the prerogative of all citizens to engage in out-of-state activities which are engaged in by the citizens of the state wherein the activity takes place. This attempted control of out-of-state activities implicates the protection for all citizens guaranteed by Article IV, Sec. 2 of the United States Constitution: "The citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the Several States." Stated directly, Connecticut citizens are entitled to obtain tickets in Massachusetts in the same fashion as are Massachusetts citizens.
The right of each state to regulate activities which take place solely within its own boundaries, particularly in matters of "male prohibita" goes to the heart of Federalism, the preservation of which prerogatives were in fact the catalyst which encouraged and enabled the states to form this federal constitutional government.
"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Amendment X
United States Constitution.
This court cannot discern how, constitutionally, one state can superimpose its internal laws upon another state, directly or indirectly, so as to deprive its own Connecticut citizens of the right to engage in activities which occur solely and exclusively outside its own borders. Such matters may be handled by reciprocal legislation, or by federal law, but are not able to be regulated by the internal laws of a state, other than the state in which the activity solely and exclusively takes place. In passing the court notes, in reviewing the legislative history, that the legislature specifically rejected the prospect of declaring the possession of such tickets to be contraband. This being the case, this state cannot prohibit its citizens from traveling to another state for the purpose of obtaining prime tickets, nor may this state indirectly accomplish such CT Page 12541 prohibition through the method sought herein.
As a last comment, although not apparently so intended, the requested injunction, sought to be applicable only to sales to "Connecticut citizens" would inferentially allow Connecticut ticket sellers to internally accomplish Connecticut sales of Connecticut tickets to persons who are not Connecticut citizens for amounts in excess of the three-dollar limit. That activity is clearly prohibited by statute.
It should be further obvious that the practical benefit of constitutional sovereignty allows, for example, citizens of other states where casino gambling is prohibited, to come to this state for casino gambling. The implications of allowing one state to directly or indirectly dictate to another what shall be the internal doings of another state is fundamentally constitutionally repugnant, and cannot be accomplished by internal legislation or judicial decree seeking to regulate the conduct of activity engaged in solely within another state.
 III
The defendant claims that the state, in bringing this action, is engaging in selective prosecution. Assuming, arguendo, that this action, though a civil action, is sufficiently allied to the principles of criminal law by virtue of the request for civil monetary penalties, yet this defense is not supportable under the facts of this case.
"A defendant claiming discriminatory prosecution must show (1) that others similarly situated have generally not been prosecuted and that he has been singled out and (2) that he is the victim of invidious discrimination based on impermissible considerations such as race, religion, or the exercise of a constitutionally protective right." State v. Dilossantros,211 Conn. 258, 287 (1989), citing United States v. Berrios,
501, F.2d 1207, [501 F.2d 1207], 1211 (2nd Cir. 1974). See alsoGold v. DiCarlo, supra, p. 820.
The defendant has produced no evidence whatsoever, nor can the court infer, that circumstances exist such as to meet the second prong of the criteria set forth in State v. Dilossantros,
supra. Hence this defense must fail.
IV CT Page 12542
The defendant claims that the State of Connecticut is estopped from enforcing Connecticut General Statutes § 53-289
against the defendant, concerning any Springfield connected activity.
The defendant claims that in 1987 the State commenced an action to prosecute this matter against the defendant. Various documents have been submitted to the court. Exhibit 4, the Complaint, Exhibit 2 (a transcript of part of those proceedings), Exhibit G, a letter from the Attorney General to Attorney Nicholas Cardwell, Esq., and Exhibit J, an agreement between the Attorney General and Attorney Cardwell on behalf of the defendant, set forth in the letter of the Attorney General, dated February 27, 1991.
That complaint does not specify whether it is addressed to activity only from the Hartford office or, conversely, from the Springfield office, or a combination thereof. However, the correspondence clearly indicates that the issue of the Springfield office activity was directly at issue between the parties at that time.
In a proceeding before the court on August 9, 1989, Judge O'Connor was very complimentary to Mr. Roderick Cardwell as to his candor. "I felt that you were a fine witness, that you answered with candor, and that you fully answered all questions." Exhibit F. Judge O'Connor further stated ". . . And the court's impression was that you certainly were trying to abide by the laws of both the Commonwealth of Massachusetts and the State of Connecticut." Exhibit F.
Mr. Cardwell had testified before Judge O'Connor that at the legislative public hearing Attorney General Liebermann had indicated that the State of Connecticut "would have a problem with jurisdiction over any ticket agency or ticket broker whose offices were located outside the State of Connecticut and that those people would be subject to the jurisdiction of the state they were in. Thereby saying, in other words, if these guys want to move out of state, it's OK with us."
This court has no way of knowing whether this was an accurate interpretation of the Attorney General Liebermann's comments, but it appears from Judge O'Connor's comments that, as to the defendant, it was undoubtedly an honestly held belief concerning CT Page 12543 the substance of the Attorney General's comments to the legislature.
That case was settled by a settlement agreement. See Defendant's Exhibit J, the settlement letter from Attorney General Blumenthal, by Assistant A. G. Fishman. The Attorney General's letter to Attorney Nicholas Cardwell the previous year, Exhibit G, in proposing settlement states in part as follows: "I do not believe, at this time, that we would be able to resolve the State's concern over sale of tickets to Connecticut events for Springfield. However we may be able to agree on in-state sales to Connecticut." Exhibit G.
The final settlement agreement, Exhibit J, provides in pertinent part as follows:
 1. There is no admission of wrongdoing by your client.
 2. Your client assures that he shall voluntarily comply with the terms of Conn. General Statutes § 53-289 by not selling tickets in Connecticut to Connecticut Entertainment events at more than $3.00 over the price printed on such ticket.
(Emphasis by this Court.)
 3. The resolution of this action shall have no binding effect on either party or adjudicate any issues with regard to your client's ticket business, other than referred to in paragraph 2.
It is not contended that the defendant has ever violated this agreement.
The defendant continued to operate the Springfield, Massachusetts office of his ticket business. There is no evidence that he made any change in his business in Springfield or did anything to his detriment in reliance upon the plaintiff's then forbearance to at that time seek enforcement action as concerns the activity connected with the Springfield office.
In general, estoppel may not be invoked against a governmental agency. Langan v. Weeks, 37 Conn. App. 105, 124
(1995). "Estoppel against a public agency is limited and may be CT Page 12544 invoked. (1) Only with great caution; (2) only when the action in question has been induced by an agency having authority in such matters: and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency." Kimberly-ClarkCorporation v. Dubona, 204 Conn. 137, 148 (1987). Further, "the other party must change its position in reliance on those facts, thereby incurring some injury." Kimberly Clark Corporationv. Dubona, supra, p. 148.
The court finds that the continuing operation of the activities of the Springfield office were not induced by the plaintiff. The defendant has not demonstrated that he changed his position in any fashion by virtue of the state's failure to proceed with the enforcement action in 1991. He has incurred no detriment by any act of forbearance of the plaintiff.
Hence the court rejects the defendant's contention that the plaintiff be estopped from prosecuting this action.
 IV
The defendant contends that the court lacks subject matter jurisdiction over this activity. The Connecticut activities of the defendant have been previously articulated in this decision. Those activities, advertising for sale, referrals, sales, offering to sell, negotiations, transmitting tickets into this state for Connecticut delivery, etc. sufficiently comply with the legally understood concept of the transaction of business in this state. "In determining whether the plaintiff's cause of action arose from the defendant's transaction of business in this state we do not resort to a rigid formula. Rather we balance considerations of public policy, common sense, and chronology and geography of the relevant factors." Zantolia v. Nisenfeld,184 Conn. 471, 477 (1981).
There can be no serious dispute in this case that the defendant conducts business in Connecticut through both his Hartford and his Springfield, Massachusetts offices.
The court has subject matter jurisdiction over sales activity which takes place in whole or in part in Connecticut. The contention of the defendant by special defense, claiming that the defendant does not through his Springfield office conduct business in Connecticut is not sustainable, as previously set forth herein. Conversely, however, the court has no subject CT Page 12545 matter jurisdiction to impose the internal laws of this state upon activity which takes place solely and exclusively outside this state. See for example Keegan v. Aetna Life and CausualtyCo., 42 Conn. App. 803, 805, 806 (1996), concerning the limitation upon powers of judicial tribunals.
 V
The plaintiff requests that the court issue an injunction. The Supreme Court, in the case of State v. Leary, 217 Conn. 404,413, 414, 415 (1991) clearly determined that violations of General Statutes 53-289 constitutes violations of Connecticut Unfair Trade Practice Act, General Statutes 42-110a et seq. The court does not of course revisit that determination.
General Statutes 42-110m allows the Attorney General to apply to the Superior Court for an order temporary or permanently restraining and enjoining the continuance of such act or acts. This action seeks such remedy.
Where the violation of General Statutes 42-110m constitutes the violation of an underlying statute, and such violation is continuous, the remedy of injunction is appropriate and compelling.
This court hereby issues a permanent injunction. The defendant Roderick Cardwell, acting by himself or through his agents, servants, employees or independent contractors acting on his behalf with his knowledge and consent, is hereby enjoined from engaging in any activity whatsoever within the boundaries of this state in connection with selling, offering to sell or attempting to sell, or mailing or otherwise delivering into this state, any ticket to an entertainment event given in this state sold for a price greater than the price fixed for admission, the price including tax printed on the ticket, plus an amount not to exceed three dollars. As stated in the body of this decision this injunction shall include any and all advertising or promotion of any type disseminated within this state including any referrals made within this state to any location outside of this state, concerning the availability, or the prospective purchase of tickets which results in the sale of a ticket at a price which is greater than that allowed by General Statutes § 53-289.
Nothing contained herein shall prevent the defendant from attending to normal business matters in conducting his business CT Page 12546 in Massachusetts, or from selling tickets to Connecticut events at his Massachusetts location notwithstanding the restrictions of CGS § 53-289, providing that no such business activity consists of, or includes, in whole or in part, any activity which is prohibited under the terms of this injunction.
 VI
The plaintiff claims that the defendant has violated Connecticut Unfair Trade Practices in a number of ways, including the violation of General Statutes § 53-289, and consequently seeks civil penalties from the defendant for such alleged violations.
The court addresses the first of these claims which relates to the general subject of statutory overcharge. The plaintiff claims that the defendant has sold at least 13 tickets per week for the past seven years, which amounts to more than 4,500 violations of the statute. and has earned over $210,000. The stipulation before the court is $30,000 per year. (The court is not certain as to where seven years comes from, as the dispute appears to be in place at least since the action commenced in March 1987.)
General Statutes 42-110o, captioned Civil Penalties, provides for ". . . a civil penalty of not more than five thousand dollars for each violation. For the purposes of this subsection, awillful violation occurs when the party committing the violationknew or should have known that this conduct was a violation of Section 42-110b." (Emphasis added.)
It appears that the only reported Supreme Court case dealing with this subject is Eamiello v. Liberty Mobile Home Sales, Inc.,208 Conn. 620 (1988).
 We do not believe that the legislature intended that the penalty imposed upon those who have a reasonable belief that their constitutional rights have been violated and thus discourage them from asserting their rights. Whether there is such a reasonable basis is, of course, a question of law. In the present case we have concluded that there was a sufficient merit to the defendant's claim of unconstitutionality as to preclude a finding that it was unfair or deceptive. CT Page 12547
Eamiello, supra, p. 554. (Emphasis added)
This court addresses both the statutory criteria and the criteria articulated by the court in Eamiello, supra. First, as to the statutory criteria of "knew or should have known." The court is in complete agreement with the comments of Judge O'Connor, in the previous litigation, as to the candor and veracity of Mr. Roderick Cardwell. The court concludes that Mr. Cardwell did not in fact know or should have known that his activity was a violation of this statute.
The court recognizes that subjective good faith alone is not a defense to a CUTPA violation. Eamiello, supra, p. 654.
The issues in this case raise serious constitutional questions. The court does not intend to revisit all of the constitutional issues, properly raised in this case, and as are addressed in meticulous and comprehensive detail by counsel on both sides of this issue. It is obvious that the Attorney General for the State of Connecticut, in 1991, was sufficiently concerned about the constitutional issues such that the state was prepared to settle the case and leave unresolved the issue of the Springfield activity, fully knowing that this activity was to continue. That is certainly an indication that the constitutional issues raised herein were regarded by both the state and the defendant as bona fide issues which are not easily resolved.
The very nature of these statutes has been a source of continuing constitutional debate throughout this nation for seventy years. At least since the United States Supreme Court, inTyson Brother v. Barton, supra, when by a closely divided court, the United States Supreme Court first determined that the statute in New York was unconstitutional, to be followed by the Supreme Court reversing itself in 1964. Yet questions arise and persist throughout the various jurisdictions, and are here made more complicated by the prospect of interstate application, which to this day apparently has not been resolved, let alone litigated, through prior litigation in any forum.
This court further determines that, applying the Eamiello,supra, criteria, under the circumstances of this case there was sufficient merit to the defendant's honestly held and reasonable belief of unconstitutionality, particularly as to the requested blanket ban of the Springfield, Massachusetts activity, such as CT Page 12548 to preclude a finding that civil penalties are warranted under General Statutes § 42-110o as concerns the claims of violation of General Statutes § 53-289.
Although this court has issued an injunction, with the comprehensive provision of no Connecticut offer, sale, referral, promotion, advertising, or delivery, that fact does not call for or result in a conclusion that civil penalties are warranted by virtue of that activity. To the contrary, the court determines that civil penalties are not warranted as concerns the fact of prices in excess of the statutory criteria for Connecticut activity involving the Springfield office.
 VII
Other requests for relief and penalties pertaining to specific incidents are as follows. During the course of the case the plaintiff presented seven witnesses to support the plaintiffs claim of individual instance of Unfair Trade Practices: Helen P. Fletcher, Linda Martin, Harold Keller, Lynn Boivin, Mary Lou Lupovitch, Cyrilla Bergeron and Susan Warner. These claims pertain to specific business dealings with particular customers.
In addition to penalties provided by § 42-110a the State also seeks restitution under § 42-110m.
1. As to Ms. Fletcher: She had attempted to obtain tickets from the Springfield office to attend an event at the Hartford Civic Center. She is from New London. She had called the Hartford Civic Center three times unsuccessfully. Thereafter, when she was quoted a price by the defendant she declined to purchase. No pressure whatsoever was placed on her. She did not attend the event. Her complaint is that the quoted price was higher than she wished to pay. The Attorney General does not press this claim. She had no loss.
The court does not award penalties on this complaint, for the reasons previously set forth.
2. As to Ms. Martin: She purchased tickets for the Hartford Civic Center Reba McEntire concert. She then complained that the ticket price was too high. She was notified that she could return the tickets for a full refund. She decided to keep the tickets and attend the concert. CT Page 12549
Having been offered full restitution by the defendant which she declined, the court does not order restitution, as the court has determined that this charge, through the Springfield office, did not constitute a knowing violation of CUTPA, and that restitution was offered and rejected.
The court does not order penalties, for the reasons previously set forth.
3. Ms. Bergeron: She purchased two tickets to the Jimmy Buffet concert at the Meadows Music Theater in Connecticut. She paid $138 per ticket for two tickets. She elected to buy the tickets and could have received a full refund and not attended the concert, if so requested. The court does not order restitution. For the reasons set forth aforesaid, the court does not order penalties.
4. Ms. Van Ormer: She purchased two tickets to a performance at the Meadows Music Theater in Hartford. She did not seek a refund. She chose to attend the concert. The court does not order restitution.
For the reasons set forth aforesaid, the court does not order penalties.
Ms. Van Ormer testified that when she called the Department of Consumer Protection she was told not to contact the defendant with her complaint. This advice appears to be inappropriate, as the defendant cannot be expected to handle consumer complaints that he does not know about, if the department discourages the communicating of complaints.
5. Ms. Boivin: She was told by the defendant's employee that she was purchasing tickets for an area of seating, told to her, by the defendant's employee, to be the "Golden Circle," for the performance of a "Pink Floyd" event at Foxwoods in Massachusetts. The tickets which were actually delivered were far distant from the front of the stage the "Golden Circle" for which she had paid. They were off to the side and she could barely see the stage, and she could barely make out the performers. She received only marginal seats available to the general public and was charged for prime seats. The court determines that this constituted a deceptive practice. The court determined that she is entitled to reimbursement of $180, as she received seats reasonably worth $35 per ticket. CT Page 12550
The court assesses a civil penalty of $1,500, per General Statutes § 42-110(b).
6. Ms. Lupovitch: She purchased tickets for the James Taylor Concert in New Haven. The tickets were represented to her as being right in front of the stage. They were not right in front of the stage, but were in a far inferior location. The defendant claims that his employees did not have a seating chart. The court concludes that they should not have represented where they were if they did not know where they were. Ms. Lupovitch was in fact thereafter able to obtain a seating chart from the venue.
The court finds that this was a deceptive practice, as she paid for prime seats and received only marginal seats, available to the general public. The court orders restitution in the amount of $185. The court assesses a civil penalty of $1,500 per General Statutes § 42-110(b).
7. Harold Keller: The defendant contracted with Mr. Harold Keller to provide him with four tickets to the Kentucky Derby, in the amount of $350 per ticket. The seats were promised to be at the "1/8 pole" which would have provided a clear view of the finish line, which was important as that is the ultimate culmination point of the race.
The defendant promised the furnishing of the tickets by April 23 for the May 7 event. Each day for five days, following April 23, he called Ticketworld, was assured he would have the tickets, and was given a different excuse each day. He did go to Kentucky. On May 5, while in Kentucky, tickets were delivered to him. They were not at the requested location, the "1/8 pole," but were at a remote location where he was unable to realistically see the finish line. "The seat next to us would have been in the parking lot," he testified.
To the credit of the defendant Cardwell he paid an additional $1,200 to obtain the substitute seats for Mr. Keller, for which Keller had paid the defendant $1400, and Mr. Keller was not charged the additional $1,200. Yet that does not excuse the activity of the defendant in promising realistically desirable seats without having a pre-commitment that the tickets would be available, or at least telling Mr. Keller that the availability of the seats were uncertain. CT Page 12551
The court determines that under the circumstances this was a deceptive trade practice, and that the substitute seats were totally unacceptable and were only taken because, at the time of delivery, Mr. Keller had already traveled to Kentucky. The court orders restitution in the amount of $1400.00, the price charged and paid for the substitute unacceptable tickets; the court assesses a penalty of $2,000. This penalty may have been greater had not the court taken into consideration the fact that the defendant spent an additional $1200 of his own funds in obtaining substitute, though realistically unacceptable, seats for Mr. Keller.
 VIII
The defendant failed to file a trade name certificate in violation of General Statutes Sec. 35-1. The statute provides that failure to file said certificate shall be a violation of CUTPA, General Statutes § 42-110b. The plaintiff has produced no evidence to indicate that any person has suffered or has claimed to have suffered any harm by virtue of this failure. For reasons of privacy at home he chooses to be known by the name Bouchard. Yet at work he attends to all items of business and readily answers to persons who call for him, by that name. He filed a certificate of trade name when it became known to him that the law so required, and has filed it under his given name Cardwell.
This is, nonetheless, a per se violation of CUTPA. Consequently the court assesses a penalty of $1,000.00 for violation of the trade name statute. Sec. 35-1.
 IX
The court determines that the aforesaid decision is sufficiently clear so that the defendant will know and understand what is necessarily expected of him in the course of daily business as a ticket vendor. The court does not intend to micromanage the defendant's business by issuing other injunctions, as the assessing of penalties for the proven specific conduct should alert the defendant as to what is expected of him in the conduct of his business.
Sullivan, L., J. CT Page 12552